1

2  IN THE UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ---------------------------x
   IN THE MATTER OF:                    CASE NO. 22-10353-mg
5                                       CHAPTER 7
   JULIANNE MICHELLE REEVES,
6
                DEBTOR.
7  ---------------------------x

8  KARL REEVES,

9               PLAINTIFF,

10 vs.                                  ADV. NO. 23-01028-mg

11 JULIANNE MICHELLE REEVES, ET AL.

12              DEFENDANTS.
   ---------------------------x
13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, NY  10004

17

18          Monday, April 1, 2024

19          10:01 a.m.

20

21
   B E F O R E:
22
   HON. MARTIN GLENN
23
   U.S. BANKRUPTCY JUDGE
24

25 ECRO:  F. FERGUSON

     Acorn Transcripts, LLC      1-800-750-5747      www.acornfla.com

 1                    A P P E A R A N C E S:

 2

 3   JULIANNE MICHELLE REEVES,      BY:  JOSHUA A. DOUGLASS, ESQ.
       PLAINTIFF                         JOSHUA A. DOUGLASS LAW
 4                                       122 RTE 44
                                         MILLERTON, NY  12546
 5
     KARL REEVES, DEFENDANT         BY:  ANDREW S. RICHMOND, ESQ.
 6                                       RICHARD LEVY, JR., ESQ.
                                         JOSHUA WEIGENSBERG, ESQ.
 7                                       PRYOR CASHMAN, LLP
                                         7 TIMES SQUARE
 8                                       NEW YORK NY 10036

 9   ECRO:                               F. FERGUSON
                                         U.S. Bankruptcy Court
10                                       SDNY
                                         One Bowling Green
11                                       New York, ,NY  10004

12

13   TRANSCRIPTION SERVICE:              ACORN TRANSCRIPTS, LLC
                                         3572 Acorn Street
     North Port, FL  34286
14                                       (800) 750-5747
                                         www.acornfla.com
15

16

17

18

19

20

21

22

23
           Proceedings recorded by electronic sound recording;
24            transcript produced by transcription service.

25

1

2                        C A L E N D A R

3    22-103520mg  Julianne Michelle Reeves  Ch. 7

4    Adversary proceeding: 23-01028-mg,
     Reeves v. Reeves et al.
5    IN COURTROOM Damages Inquest.
     (Doc ##42, 44, 49 to 55)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Julianne Michelle Reeves, Debtor                                    4

1                    P R O C E E D I N G S

2   (On the record 10:01 a.m.)

3          THE COURT:  Please be seated.  All right.  Good

4   morning.

5          ALL:  Good morning, Your Honor.

6          THE COURT:  All right.  So we're here in

7   connection with the damage's inquest following the entry of

8   the bulk judgment against Joshua A. Douglass.  Both sides

9   have filed papers in connection with it.

10          Mr. Levy, are you going to be --

11          MR. LEVY:  Good morning, Your Honor.  Richard Levy

12   of Pryor Cashman.  I'm joined by my partner Joshua

13   Weigensberg, who will represent me as the witness in this

14   matter, along with my associate Andrew Richmond.

15          If Your Honor wishes any preliminary statements or

16   arguments, I'm prepared to do that, but we can rest on our

17   papers pretty much.  We will have an additional explanation

18   about one of the exhibits during my testimony.  And we may

19   actually explain to the Judge that there may be some request

20   to amplify the amount of the fees based on the circumstances,

21   but we'll explain.

22          THE COURT:  All right.  I've read everything in

23   connection with it.

24          Mr. Douglass, is there anything you want to say

25   before we begin?

Julianne Michelle Reeves, Debtor                                                    5

 1            MR. DOUGLASS:  I'm sorry?

 2            THE COURT:  Is there anything you wish to say

 3  before we begin?

 4            MR. DOUGLASS:  Yeah.  I just -- it seems like

 5  we're jumping into the issue of their fees.  And at the

 6  inquest, I believe it's also relevant and necessary for them

 7  to have a damaged party here in court.  Mr. Reeves is

 8  asserting himself as the damaged party and the Plaintiff,

 9  and he doesn't appear to be ready or present to take the

10  stand to explain what damages he suffered, other than just

11  jumping into, say, and that he had to pay the fees.

12            What was the damage other than these fees that he

13  suffered, that required him to go out and hire attorneys and

14  then defend himself?

15            Your Honor, I'm not sure -- and by your face, I

16  can tell maybe you don't understand it.  You know, the fact

17  of the matter is the law states very clearly --

18            THE COURT:  Is this in your brief?  You filed --

19            MR. DOUGLASS:  Yes.

20            THE COURT:  You filed a very short affidavit.

21            MR. DOUGLASS:  Yeah.  It's clear, fees and costs

22  are not recoverable unless the motivation of the malicious

23  acts complained of constitute a disinterested malevolence

24  and -- on the defendant's part.

25            THE COURT:  That case arises in the context of --

1  did it arise in the context of a judgment for fraud on the

2  Court?

3          MR. DOUGLASS:  It arose in the --

4          THE COURT:  Did it arise in the context of a

5  judgment --

6          MR. DOUGLASS:  I'm not sure.

7          THE COURT:  -- having been entered for fraud

8  against the Court?

9          MR. DOUGLASS:  I'm not sure.  But it sounds like

10 I'll get rich today.  So you know, that's your prerogative.

11 If that's what you choose to do --

12         THE COURT:  Mr. Douglass.  Mr. Douglass.

13         MR. DOUGLASS:  Here we go already.

14         THE COURT:  If you keep up the comments like that,

15 and you're going to wind up with another sanction.

16         MR. DOUGLASS:  I'm just talking the truth.

17         THE COURT:  Go sit down.

18         Mr. Levy, just to be clear, are you the only

19 witness who's going to testify?

20         MR. LEVY:  I am, Your Honor.

21         THE COURT:  Okay.  Why don't you come and take the

22 witness stand.

23         MR. LEVY:  Thank you, Judge.

24         THE COURT:  You will be sworn.  If you'd raise

25 your right hand to be sworn in.

Julianne Michelle Reeves, Debtor                              7

1              MR. LEVY:  Good morning.

2                    WITNESS, RICHARD LEVY, JR., SWORN

3   (Oath administered)

4              THE WITNESS:  I so swear.

5              Good morning, Your Honor.

6              THE COURT:  Please have a seat.

7              THE WITNESS:  Thank you.

8              THE COURT:  Good morning.

9              COURT REPORTER:  Tell me your name again, I'm

10  sorry.

11             MR. WEIGENSBERG:  Good morning, Your Honor.  Yes.

12  Joshua Weigensberg.  I am a partner of Mr. Levy's from the

13  litigation group.

14             THE COURT:  Go ahead, Mr. Weigensberg.

15             MR. WEIGENSBERG:  And Your Honor, just before I

16  get started, housekeeping matters in terms of Your Honor's

17  preferences, we have filed our papers, including Mr. Levy's

18  declaration, and supporting exhibits on ECF.  I believe

19  courtesy copies were provided.  We have additional copies

20  here if Your Honor would like.

21             THE COURT:  I have copies already.

22             MR. WEIGENSBERG:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             But what you should do is offer the declaration

25  and exhibits in evidence, and then I'll let you continue

Julianne Michelle Reeves, Debtor                                        8

1  with some direct examination.

2          MR. WEIGENSBERG:  Thank you, Your Honor.

3          So we would at this time like to offer Mr. Levy's

4  declaration and Exhibits A through E to his declaration into

5  evidence in this hearing.

6          THE COURT:  What's the ECF docket number?

7          MR. WEIGENSBERG:  If Your Honor would give me one

8  minute, I will direct you to the ECF.  Mr. Levy's

9  declaration is Document 51.  And I believe that the exhibits

10  are sub-numbers of that entry.  And again for the record,

11  Exhibits A through E.

12          THE COURT:  All right.  Any objection?

13          MR. DOUGLASS:  I'm not going to object to anything

14  that they do.  Just go for it.

15          THE COURT:  All right.  The Levy declaration and

16  Exhibits A through E are admitted in evidence.

17          (Exhibit 1, attachments A through E admitted into

18  evidence.)

19          THE COURT:  Go ahead, Mr. Weigensberg.

20          MR. WEIGENSBERG:  Your Honor, pursuant to your

21  rules, we would like to submit Mr. Levy's declaration, you

22  know, as -- in lieu of largely his direct, you know, oral

23  testimony here.  But I think that we would like to maybe

24  make a couple statements to amplify the record, and to make

25  sure that everything is clear for Your Honor.

1           THE COURT:  Go ahead.

2           MR. WEIGENSBERG:  Okay.  Thank you.

3                        DIRECT EXAMINATION

4  BY MR. WEIGENSBERG:

5  Q    Good morning, Mr. Levy.

6  A    Good morning.

7  Q    So in connection with this matter, did you submit the

8  -- your affidavit or your -- I should say your declaration

9  to establish the amount of fees incurred?

10 A    I did.

11 Q    And just a little bit of background.

12      Have you been the partner supervising this matter from

13 the beginning?

14 A    This particular matter on behalf of this client, yes.

15 Q    And I think briefly if you could describe for the

16 record the nature of the fraud on the court claims in this

17 case.

18 A    I can.

19      After we were engaged in this matter in late September

20 2021, we conducted a review of the docket and determined

21 that there were documents that we believed contained

22 incorrect statements that had been submitted to the Court

23 under oath.  This led us to correspondence with the United

24 States -- excuse me, with the Chapter 7 Trustee and

25 eventually with Mr. Douglass.  Not able to obtain any relief

 1   from Mr. Douglass, we proceeded to file the complaint based

 2   on several written documents that were contained in the

 3   record, including the statement of -- I believe it was in

 4   the statement of affairs or schedules.

 5          There were misstatements, incorrect statements

 6   relating to alleged property interests held by the Debtor,

 7   Julianne Reeves, in property that in fact of record or

 8   otherwise is held solely by Mr. Reeves, her husband, still

 9   husband, albeit that the parties are engaged in a

10   matrimonial and custody proceeding that has pended now for

11   a number of years.

12   Q    Thank you, Mr. Levy.

13        Which office of Pryor Cashman handled this matter?

14   A    This matter was handled entirely by the New York office

15   of the firm.

16   Q    And is the staffing on this matter reflected in your

17   declaration and the exhibits?

18   A    Yes, it is.

19   Q    Including Exhibits D and E, which are the invoices?

20   A    Correct.

21   Q    Okay.  Could you describe briefly the nature of the

22   staffing on this matter?

23   A    In this matter, I acted as the supervising partner.  I

24   consulted periodically with another partner of the firm, Eli

25   Nathanson, who was the engagement partner, but did not bill

1   any time.

2           In addition to myself, we were staffed with an

3   associate named Sameer Alifarag and/or Mr. Andrew Richmond.

4   Most of the time, the staffing was just me and one or the

5   other of my associates.

6           I consulted with Mr. Lieberman, Seth Lieberman,

7   the chairman of our department, I think once.  And we had a

8   para-professional named Charron French, who was assigned to

9   the matter for the entire term of our engagement.

10  Q    Thank you, Mr. Levy.

11       Were the fees charged to Karl Reeves on this matter the

12  typical fees of the firm, plus a discount?

13  A    The fees charged in this matter were standard rates for

14  Pryor Cashman personnel, legal professionals, and para-

15  professionals.  In addition, the engagement partner extended

16  to Mr. Reeves a 15 percent discount on our professional

17  fees.

18  Q    Mr. Levy, do you recall, then one of the Court's prior

19  orders, there was a question about whether the Trustee in

20  this -- in the relating bankruptcy proceeding was contacted

21  by the Pryor Cashman office or by Karl Reeves?

22  A    I do recall reading that in the judge's order and

23  corrected order.

24  Q    And was the Trustee contacted by Pryor Cashman or Mr.

25  Reeves?

Julianne Michelle Reeves, Debtor                          12

1  A    The Trustee was contacted by Pryor Cashman.

2  Q    Okay.  Do you recall approximately -- and was that --

3  was there -- that by letter?

4  A    We corresponded with the Chapter 7 Trustee, Salvatore

5  LaMonica by letter, and later by telephone.  This occurred

6  in, I believe, late October 2022.

7         MR. WEIGENSBERG:  And Your Honor, as you had asked

8  that question in your earlier amended opinion and order, we

9  do have the letter if Your Honor would like us to amplify

10 the record and provide it.  Otherwise, I will continue.

11        THE COURT:  Your decision whether you're going to

12 offer it, or Mr. Douglass can ask that you produce it to

13 him.

14        MR. WEIGENSBERG:  We would just -- we would

15 continue on, unless Your Honor has questions about it.

16        THE COURT:  Go ahead.  I am going to have some

17 questions about his contacts with Mr. LaMonica.

18        MR. WEIGENSBERG:  Okay.  So perhaps at that point.

19 Thank you, Your Honor.

20 BY MR. WEIGENSBERG:

21 Q    Mr. Levy, Exhibits D and E to your declaration that

22 you've submitted for this inquest, do those two exhibits

23 reflect time entries for work actually performed for this

24 matter?

25 A    They do.  Exhibit E represents the first bill that was

Julianne Michelle Reeves, Debtor                    13

1  rendered to the client for the period, I believe, beginning

2  with November 2021 -- 2022.  Exhibit E, as filed, is a draft

3  of a bill, but reflects the time that was recorded through

4  the end of the period covered by that draft bill.  I don't

5  recall the end date off-hand.

6  Q    So Mr. Levy, is it the case, then, that there was some

7  additional work performed at or around the time that Exhibit

8  E ends, and subsequent thereto in connection with this

9  matter?

10 A    Yes.

11 Q    Do you recall approximately how many dollars in

12 attorney's fees additional -- I'll call them additional

13 attorney's fees were incurred?

14 A    From the cut off date on Exhibit E through the end date

15 of the bill that was later rendered in December 2021, I

16 believe, there was an additional $14,000 of time, some

17 portion of which was through the date on which the complaint

18 was filed in this matter, and some portion of which -- the

19 -- I'm sorry, the damages demand in this matter, the default

20 motion, and some portion of which post-dated the filing of

21 that motion.

22 Q    Okay.  Thank you, Mr. Levy.

23       In your experience, are Pryor Cashman's rates that were

24 charged here lower, higher, the same as other law firms that

25 may come before this Court?

Julianne Michelle Reeves, Debtor                              14

1  A     I would answer it this way.  Pryor Cashman describes

2  itself as a mid-size firm, unlike big law.  We have less

3  legal personnel and our overhead is different.  As a result

4  of which, our fee structure is less than big law firms.

5  However, we believe that our fees are competitive and

6  consistent with firms of our size, both in the bankruptcy

7  field and in our general practice.

8  Q     And in your experience, were the fees -- the time spent

9  on this matter and the associated fees and costs and

10  disbursements charged to the client reasonable, given the

11  complexity of this matter and Mr. Douglass's default?

12  A     I do so believe.

13  Q     Okay.

14         MR. WEIGENSBERG:  So Your Honor, we have with us

15  the final bill that was rendered for the later period.

16  Exhibit E, as Mr. Levy testified, is an accurate invoice or

17  draft that was generated at a time that, I believe the

18  default motion was prepared, reflecting such that the

19  approximately $95,000 referenced in the default judgment

20  motion is reflected as between Exhibits D and E.  We do have

21  the final invoice --

22         THE COURT:  Is there a difference between the

23  final and the draft?

24         MR. WEIGENSBERG:  The difference is that there are

25  additional entries in the final.  It's not that there have

1  been -- that it's a reduction.

2          THE COURT:  When was the final prepared?

3          MR. WEIGENSBERG:  The final was prepared, I

4  believe --

5          THE WITNESS:  December 2023.

6          MR. WEIGENSBERG:  December 21st, perhaps.

7          THE COURT:  How come you didn't submit it with the

8  other papers?

9          MR. WEIGENSBERG:  Your Honor, we identified in

10 preparing for today's hearing that, in fact, the draft was

11 submitted rather than the final, which was, you know, simply

12 an omission.  While the draft is accurate, and we're happy

13 to stand by it and proceed on those grounds, there were

14 certain additional charges --

15         THE COURT:  Well, let's see if Mr. Douglass wants

16 -- right now, I've got -- you know, there was a deadline for

17 submitting things.  I've got what's marked as the draft.

18 You've talked about it.  Let's see whether -- what comes up

19 in cross-examination.

20         MR. WEIGENSBERG:  I'm sorry, Your Honor?

21         THE COURT:  We'll see what comes up in cross-

22 examination.

23         MR. WEIGENSBERG:  Okay.  So -- I'm sorry, Your

24 Honor.  I apologize if I misunderstood.

25         THE COURT:  I'm not taking the additional exhibit

1  unless Mr. Douglass asks for it and he wants to use it.

2            MR. WEIGENSBERG:  Okay.  Thank you, Your Honor.

3  And with that, I have no further questions, although I will,

4  you know, ask for redirect.

5            THE COURT:  Cross-examination.

6            MR. DOUGLASS:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8  BY MR. DOUGLASS:

9  Q    It's Mr. Levy, correct?

10  A    It is.  Good morning, Mr. Douglass.

11  Q    Good morning, sir.  Great to see you.

12       So I was in church yesterday and the pastor said, give

13  unto Ceasar what is Ceasar's.  And he explained that to mean

14  that you can't take your money to heaven, while personal

15  wealth can be stolen or taken away while here on earth.

16  What do you think about that?

17  A    I don't.

18            THE COURT:  My objection is sustained.  Let's go

19  on.

20            MR. DOUGLASS:  I didn't hear any objection.

21            THE COURT:  Well, I object and sustain my own

22  objection.  Ask questions that are relevant to this

23  proceeding.

24            MR. DOUGLASS:  You'll see how that becomes

25  relevant, Your Honor.

Julianne Michelle Reeves, Debtor                    17

 1              THE COURT:  Ask your next question, Mr. Douglass.

 2              MR. DOUGLASS:  So I'm going to be, like,

 3   steamrolled here?  Railroaded?  Is that what this Court is

 4   going to do to me?

 5              THE COURT:  We do not deal with religion in my

 6   courtroom.

 7              MR. DOUGLASS:  You're going to sanction me -- I

 8   can't talk about religions -- it's a basic --

 9              THE COURT:  Do you have another question?

10              MR. DOUGLASS:  It's a -- I have a lot of other

11   questions.

12              THE COURT:  Then ask your next question.

13              MR. DOUGLASS:  But if I'm going to be objected to

14   everything I say in this courtroom, that could be a real

15   problem.

16              THE COURT:  Ask your next question, Mr. Douglass.

17              MR. DOUGLASS:  Thanks for hearing me out, Your

18   Honor.  I really appreciate it.

19              THE COURT:  I do not permit injecting religion

20   into my courtroom.  If you have a non-religious question to

21   ask, ask your question.  I assume Mr. Levy wasn't in your

22   church --

23              MR. DOUGLASS:  I think you've got the Constitution

24   kind of confused there, Your Honor.  But you know, we also

25   have a freedom of speech.  Are you familiar with that one?

 1          THE COURT:  One more outburst from you and there

 2   will be sanctions.

 3          MR. DOUGLASS:  We live in a democracy, Your Honor.

 4   I think there's --

 5          THE COURT:  $100 sanction for your outburst.

 6   Order will be entered --

 7          MR. DOUGLASS:  On top of 130,000?  You think that

 8   bothers me?

 9          THE COURT:  Keep it up and it's going to compound.

10          MR. DOUGLASS:  Okay.  I'm an activist, Your Honor.

11   I do a lot of good things for you and everybody else.

12          THE COURT:  Do you have questions you wish --

13          MR. DOUGLASS:  I don't think you understand.

14          THE COURT:  -- to cross-examine Mr. Levy on?

15   BY MR. DOUGLASS:

16   Q   Mr. Levy, would you be surprised that I fought one of

17   the largest power plants in the State of New York to try to

18   protect us from the damage that fossil fuels are doing to

19   our planet?  Would you be surprised to hear that?

20          MR. WEIGENSBERG:  Objection.

21          THE COURT:  Sustained.

22   BY MR. DOUGLASS:

23   Q   Mr. Reeves, are you -- did you become familiar --

24          THE COURT:  This is Mr. Levy in the witness chair.

25          MR. DOUGLASS:  I know that, Your Honor.  If you're

Julianne Michelle Reeves, Debtor                    19

1  going to cut me off every time I speak, you're not going to

2  hear what I'm saying.

3            THE COURT:  You addressed him as Mr. Reeves.

4            MR. DOUGLASS:  No, I was addressing Mr. Reeves was

5  the Plaintiff, Your Honor.  You remember that?  Mr. Reeves

6  is --

7            THE COURT:  That's another $100.  200.

8            MR. DOUGLASS:  Because I'm correcting you about

9  your mistakes?  Really?

10            THE COURT:  300.

11            MR. DOUGLASS:  Oh, man.

12  BY MR. DOUGLASS:

13  Q    So, are you familiar with Mr. Reeves?  Of course you

14  are because you represent Mr. Reeves, correct?

15  A    I didn't hear your question clearly.  Would you please

16  repeat it?

17  Q    Is it not true that you represent Mr. Karl Reeves?

18  A    It is true that we represent Karl Reeves.

19  Q    Okay.  Are you familiar with the fact that I

20  represented his wife in their matrimonial action?

21  A    I am so -- it is my understanding.  I was not a party

22  in that proceeding.  It is my understanding that you

23  represented Mrs. Reeves at some point in her matrimonial

24  proceeding.

25  Q    Would it surprise you that when I got on board to

Julianne Michelle Reeves, Debtor                           20

1  represent Mrs. Reeves, that her prior attorney who was paid

2  by Mr. Reeves actually had said that the only person that he

3  was going to put on the stand was Mrs. Reeves; would that

4  surprise you?

5  A    I have no knowledge about what you are speaking, so

6  it's hard for me --

7  Q    I'm not asking you about your knowledge.  I'm asking

8  you about whether you'd be surprised to hear that.

9  A    I have no feeling one way or another, as I am not

10  familiar with your dealings with Mrs. Reeves at that time or

11  the conversation about which you are referring.

12  Q    So did you investigate me at all in the process of

13  coming after me like you are?

14  A    I would describe it a little differently.

15  Q    I ask the question.  You answer the question, Mr. Levy,

16  or whatever your name is.

17  A    I would describe my answer this way.  That when we

18  encountered the difficulties in this matter, which have been

19  deemed established by your default, we then engaged in

20  background information concerning where you were located,

21  where your office was located, and where we could effectuate

22  service.

23  Q    All right.  Thank you.

24  A    We also --

25  Q    So --

1  A    May I finish my answer, Your Honor.

2         THE COURT:  Do not interrupt him.  You asked for

3  his answer.  He's giving --

4         MR. DOUGLASS:  I've gotten the answer to my

5  question, Your Honor.

6         THE COURT:  Don't interrupt the witness.

7         MR. DOUGLASS:  Don't interrupt me every time I

8  speak.

9         THE COURT:  Go on, Mr. Levy.

10        THE WITNESS:  We also, as is stated in the

11  complaint, engaged in some additional investigation about

12  your relationship with a lawyer in -- a former lawyer in

13  Louisiana named Charles Edward Lincoln.

14  BY MR. DOUGLASS:

15  Q    Okay.  Thank you.

16       So my next question is what was the -- what were the

17  services that you provided to Mr. Reeves to deal with the --

18  strike that.

19       What was the initial issue that Mr. Reeves came into

20  your office to discuss with you?

21        MR. WEIGENSBERG:  Objection.  I --

22        THE COURT:  Sustained.

23        MR. WEIGENSBERG:  Thank you, Your Honor.

24  BY MR. DOUGLASS:

25  Q    So we can take it that the initial issue, as you stated

 1 | in your direct examination, was that -- there were incorrect

 2 | statements in our bankruptcy filings, correct?

 3 | A    Yes, as further amplified in the complaints filed over

 4 | my signature.

 5 | Q    Okay.  It was a yes or no question.

 6 | A    It is a yes, as can --

 7 | Q    So it was a yes or no question.  So you answered yes.

 8 | Thank you very much.  You answered yes.  Now we're going to

 9 | move on to my next question.  I'm doing the questioning and

10 | you're doing the answering.  Maybe you haven't been on the

11 | other side, but that's how it works.

12 |          THE COURT:  That's another $100.

13 |          MR. DOUGLASS:  For what?

14 |          THE COURT:  For lecturing the witness

15 | inappropriately.

16 |          MR. DOUGLASS:  He doesn't even seem to understand

17 | how to testify.

18 |          THE COURT:  Go sit down.

19 |          MR. DOUGLASS:  Are you seriously cutting my --

20 |          THE COURT:  Yes, I am.

21 |          MR. DOUGLASS:  You're cutting my questions off.

22 | Is that what you're doing right now?

23 |          THE COURT:  Ask proper questions, Mr. Douglass.

24 |          MR. DOUGLASS:  I am answering (sic) proper

25 | questions and he needs to answer them properly.

1          THE COURT:  I decide whether you're asking proper

2   questions.

3          MR. DOUGLASS:  And you don't get to decide who has

4   to sit down.  That is not your job.

5          THE COURT:  500.

6          MR. DOUGLASS:  Fine.  You think you're scaring me?

7   Six now?  Do you want to go to six?

8          THE COURT:  Do you have another question?

9          MR. DOUGLASS:  I have a lot of other questions if

10  I would stop being cut off by you, Your Honor.

11         THE COURT:  Do you have another question to ask

12  the --

13         MR. DOUGLASS:  I have a lot of other questions.

14  BY MR. DOUGLASS:

15  Q    So your answer was, yes?

16  A    Yes.

17  Q    You guys keep looking at each other.  And it's showing

18  me you guys play golf together.  I don't know.  But it's

19  time that you see what's going on in the world and stop this

20  kind of behavior.  Okay?

21         THE COURT:  600.

22         MR. DOUGLASS:  It's, you know, whatever.  I'm here

23  to, like, I protect democracy.  And I do that every day with

24  a lot of activists.  You know what I mean, activists?  So my

25  next question is --

 1          THE WITNESS:  My answer was yes.

 2   BY MR. DOUGLASS:

 3   Q    What were the incorrect statements that you said were

 4   provided?

 5   A    As --

 6          MR. WEIGENSBERG:  Objection.  I don't see how this

 7   is relevant.

 8          MR. DOUGLASS:  The correct statements that were

 9   provided to the bankruptcy that they're saying was the

10   initial problem isn't relevant?

11          THE COURT:  Overruled.

12          MR. DOUGLASS:  Come on.

13          THE WITNESS:  The statements that we challenged,

14   as set forth in the complaint, which I don't have in front

15   of me at this moment, but based on my recollection were that

16   Mrs. Reeves, in documents that you either cosigned with her

17   or filed on her behalf, asserted interests in corporate

18   entities and real property that she said she had an

19   ownership interest in.  We believe, and determined, that

20   those statement were false.  And those statements are

21   established by your default in this matter.

22   BY MR. DOUGLASS:

23   Q    Yeah.  You've already said that.  So I thank you for

24   clarifying once again the exact same words that you said

25   about --

Julianne Michelle Reeves, Debtor                            25

1          THE COURT:  Ask your next question.

2          MR. DOUGLASS:  I can't ask questions the way --

3  you know, I'm -- like, this is absurd.

4  BY MR. DOUGLASS:

5  Q    So my next question is how specifically did that cause

6  harm to Mr. Reeves?

7  A    Mr. Reeves engaged us for consultations relating to the

8  bankruptcy case, which resulted in our determination that

9  there were false and incorrect statements filed over Mrs. --

10 Q    That's not the question.

11         THE COURT:  Don't interrupt the witness.

12         MR. DOUGLASS:  He's not answering the questions,

13 Your Honor.  The question was how did that harm Mr. Reeves.

14 That was the question.  Not reiterate what we already know,

15 but how did that cause harm to Mr. Reeves.

16         THE WITNESS:  Mr. Reeves was caused to expend

17 legal fees as a result of the misstatements filed in this

18 court.

19 BY MR. DOUGLASS:

20 Q    So the only damage that Mr. Reeves sustained was the

21 fact that he had to hire attorneys to pay their fees?  Was

22 there any other damage that was caused to Mr. Reeves?

23 A    Mr. Reeves' complaint states that he was damaged

24 because of the fees he was caused to incur as a result of

25 the false and misleading statements filed in documents of

1  record in this court.

2  Q    So it sounds like the answer is no.  Yes or no.  What

3  -- did he sustain any other damage other than the attorney's

4  fees?

5  A    We have only asserted the damages stated in the

6  complaint, which are the attorney's fees that Mr. Reeves was

7  caused to incur.

8  Q    So let me get this straight.  He hired you, really

9  suffering absolutely no damage because there was no damage

10  as a result of any statements that you're saying were

11  incorrect in the bankruptcy filing.  Yet he hired you, and

12  now you're looking for over $97,000 from me when there was

13  absolutely no damage to Mr. Reeves, other than having to pay

14  you the $97,000 to come after me?  Is that a yes or no?

15  A    It's not a yes or a no answer.

16  Q    Okay.  Explain yourself.

17  A    We were engaged by our client, Mr. Reeves, when he

18  became aware of the pendency of the bankruptcy case.  We

19  conducted background investigations and reviewed papers,

20  which led us to conclude that there were false and

21  misleading statements filed and documents filed in this

22  court by you over Mrs. Reeves' signature.  We engaged the

23  United States -- excuse me, the Chapter 7 Trustee on the

24  matter.

25      We then sought to have you correct the matter.  That

Julianne Michelle Reeves, Debtor                          27

1   didn't happen.  We asked you.  That didn't happen.  We then

2   availed ourselves, at Mr. Reeves' request, of the right to

3   file a complaint, seeking damages based on the fraud that

4   had been incurred by you -- that had been caused by you,

5   which led our client to incur nearly $100,000 in fees.

6           In fact, more than $100,000 in fees to get to

7   where we are today with a default judgment -- against you,

8   with a default against you, conceding the -- that concedes

9   the correctness of the allegations in the complaint.

10  Q    Would it surprise you that I was told by Julianne

11  Michelle Reeves and her mother that Mr. Reeves hired a

12  hitman?  Would that surprise you?

13          MR. WEIGENSBERG:  Objection.

14          THE COURT:  Sustained.

15  BY MR. DOUGLASS:

16  Q    Hypothetically, if I told you that I represented a

17  woman whose husband hired a hitman and then her attorney

18  went after me in bankruptcy court for something that he was

19  never harmed by, would you think that was right or wrong on

20  behalf of that gentleman who had hired a hitman and then

21  used powerful lawyers to go after the attorney who had the

22  guts to state that that's what happened in open court in

23  family court in a custody matter over a child who might go

24  with him, who hired a hitman?  Would that -- what do you

25  think about that?

Julianne Michelle Reeves, Debtor                    28

 1           MR. WEIGENSBERG:  Objection.

 2           THE COURT:  Sustained.

 3   BY MR. DOUGLASS:

 4   Q    At least it's on the record.  Would it surprise you

 5   that Julianne Michelle Reeves told me that when she was

 6   married to Mr. Reeves, Karl Reeves, that they went out for

 7   dinner, and she had a conversation with a black, gay person,

 8   and that Mr. Reeves exploded at her about that incident, and

 9   never wanted her to talk to such a person ever again?  Would

10   that surprise you?

11           MR. WEIGENSBERG:  Objection.

12           THE COURT:  Sustained.

13           MR. DOUGLASS:  Here we go.  We don't care about

14   morality in this court, I guess.

15           THE COURT:  $700.

16           MR. DOUGLASS:  Just knock it up to 1,000.

17           THE COURT:  Keep it up.

18           MR. DOUGLASS:  I'm talking about morality.  I

19   don't know what you're talking about, but --

20   BY MR. DOUGLASS:

21   Q    Where is Mr. Reeves today?

22   A    I don't know where Mr. Reeves is at this moment.

23   Q    He feels very harmed by this; doesn't he?

24   A    Excuse me?

25   Q    He feels very harmed by the fraud that I perpetrated

Julianne Michelle Reeves, Debtor                        29

1  against him?  Would that be correct?

2  A    I assume so.

3  Q    But he's not here in court today.

4  A    No, he's not.

5  Q    So apparently, he doesn't feel it's that important to

6  come and look me in the eye, and allege -- and you know, do

7  this in open court?  He doesn't feel like this day is

8  important enough for him to show up?

9            MR. WEIGENSBERG:  Objection.

10           THE COURT:  Sustained.

11 BY MR. DOUGLASS:

12 Q    Where is he -- why wouldn't your client show up today?

13           MR. WEIGENSBERG:  Objection.

14           THE COURT:  Sustained.

15           MR. DOUGLASS:  You guys are all working for the

16 wrong people.

17 BY MR. DOUGLASS:

18 Q    So how many hours did you work on this matter?

19 A    Excuse me?

20 Q    How many hours did you work on this matter?

21 A    Whatever is shown in the bills.

22 Q    You don't know off the top of your head?

23 A    No, I don't.  I believe I probably billed 40 or 50

24 hours.  It's in the document.

25 Q    But my question is your recollection --

Julianne Michelle Reeves, Debtor                              30

1   A    My recollection is that I billed several tens of hours

2   to this matter.

3   Q    And do you know what you did with those several tens of

4   hours?

5   A    It's described in the bill.

6   Q    I'm asking you, sir.  I'm not asking you to keep

7   referring to the documents.  I'm asking you for your

8   recollection.  The bankruptcy judge can step up and look at

9   me all he wants.  I'm asking for your recollection.

10  A    I'm happy to share.

11  Q    What is your recollection?

12  A    My recollection is that I supervised this matter at all

13  times, that I reviewed documents, advised my associates, and

14  assigned matters to them to be prepared, reviewed, drafted.

15  I edited.  I strategized.  I ultimately signed off on the

16  documents that were filed in this court.  I was ultimately

17  responsible to set the legal strategy in the course that we

18  took in this matter.  I drafted much of the complaint.  I

19  drafted much of the other documents.

20  Q    Can you give me anymore details about what you did in

21  this matter?

22  A    Ask me what you would like to know.

23  Q    I'm asking you what I'm asking you.

24  A    I've told you --

25  Q    Can you tell me what other details you did in this

1  matter?  That's my question.

2  A    I --

3  Q    Don't tell me I'd ask you questions.  I'm asking you

4  that question.

5  A    I don't recall all of the details in microscopic -- in

6  a microscopic degree.  They are contained in the pages of

7  time entries attached in our exhibits.

8  Q    But I'm not asking you to do that.  I'm asking you from

9  the top of your head, your -- like I keep on saying this,

10  your recollection in your head, on the stand, and not

11  microscopic but any other details you remember of what you

12  did on this matter?

13  A    All right.  We can do it as best I can chronologically.

14  Q    Great.  Thank you.

15  A    We reviewed the bankruptcy pleadings and papers in this

16  case and conferred with --

17  Q    How many pages was that?

18        THE COURT:  Don't interrupt the witness.

19        MR. DOUGLASS:  I can do whatever I want.

20        THE COURT:  No, you cannot.  No, you cannot.

21        MR. DOUGLASS:  Now you're looking over there?

22        THE COURT:  Can you get a CSO up?

23        THE CLERK:  Your Honor, we have requested one.

24  They are on their way.

25        THE COURT:  Okay.

Julianne Michelle Reeves, Debtor                          32

1          Mr. Douglass?

2          MR. DOUGLASS:  Yes.

3          THE COURT:  If you ask a question, the witness is

4   entitled to answer it.  You don't get to cut him off --

5          MR. DOUGLASS:  Like you've been cutting me off?

6          THE COURT:  Another $100.  We're up to 800.

7          MR. DOUGLASS:  I just speak truth, Your Honor.  I

8   have a problem with that.  I'm sorry.  I speak truth.

9          THE COURT:  Next question.

10         MR. DOUGLASS:  That was the next question.

11  BY MR. DOUGLASS:

12  Q   What -- do you remember -- you can read it back,

13  please, because I --

14  A   I remember the question.

15  Q   All right.

16  A   And this is going to be a narrative answer.

17         THE COURT:  Go ahead.

18         THE WITNESS:  As best I can recall, again, the

19  more detail would come in the documents that are attached as

20  Exhibits D and E.

21         Before we started billing on this particular

22  matter, we were engaged by our client to review the

23  bankruptcy case and understand what had happened in the

24  proceeding.  That was in late summer.  Starting in September

25  or early October, we can -- after we had concluded that

Julianne Michelle Reeves, Debtor                                          33

1   there were false statements, we drafted a letter to the

2   United States Trustee and started to research whether or not

3   there were any other potential remedies.

4          We communicated with, excuse me, the Chapter 7

5   Trustee.  We communicated with the Chapter 7 Trustee in a

6   letter that I ultimately signed off on.  After that course

7   proved not to result in any immediate action being taken by

8   the Chapter 7 Trustee, we then communicated or attempted to

9   communicate with you.  We revised our letter.  We made a

10  settlement proposal in that letter.

11         We were trying to get this resolved quickly.  That

12  didn't happen.  And when that didn't happen, after

13  consultations with our client, we proceeded to draft and

14  file the complaint, assemble the exhibits, and commence this

15  adversary proceeding against you and Ms. Reeves.

16         After the commencement of the adversary

17  proceeding, we then prosecuted motions for default, requests

18  for default.  Eventually, Mrs. Reeves filed her own letter,

19  and we elected not to proceed with a default against her.

20         You, on the other hand, after we had initial

21  issues in serving you at an address, we effectuated service

22  on you.  When you didn't answer, we proceeded with a

23  default.  After the default was entered by the clerk, we

24  then proceeded with permission of the Court on the

25  scheduling order to file and prosecute the motion for the

Julianne Michelle Reeves, Debtor                          34

1  entry of a default judgment against you, which is what

2  brings us here today on an inquest after Judge Glenn granted

3  our motion.

4           That, in sum and substance, is what we have done.

5  I was responsible for all of that activity and was involved

6  in all of that activity.  The details from day to day, I do

7  not remember without looking at the bill.  And I refer you

8  back to those exhibits.  That's all I have to say at this

9  point, Your Honor.

10          THE COURT:  Thank you.

11  BY MR. DOUGLASS:

12  Q   And you did all that, regardless of the fact that there

13  was actually no harm to Mr. Reeves as a result of these

14  false statements?

15          MR. WEIGENSBERG:  Objection.

16          THE WITNESS:  I disagree with --

17  BY MR. DOUGLASS:

18  Q   You can't actually articulate any harm that was done to

19  Mr. Reeves as a result of these false statements other than

20  these false statements and your legal fees?  Any harm

21  whatsoever.

22  A   We have stated -- I have stated and will restate today,

23  as stated in our complaint, that the misconduct committed by

24  you and your client caused Mr. Reeves harm.  And that harm

25  is manifested in the attorney's fees he was caused to incur

Julianne Michelle Reeves, Debtor                    35

1   to attempt --

2   Q    But you --

3   A    -- may I finish, please?

4   Q    Go for it.

5   A    That --

6   Q    I mean, it was a specific question that you're not

7   answering.

8            THE COURT:  Mr. Douglass, don't interrupt the

9   witness.

10            THE WITNESS:  Your Honor, may I ask the court

11   reporter --

12            THE COURT:  No.  It's – no, (indiscernible) read

13   back.

14            THE WITNESS:  Sorry.  Sorry.  Sorry.

15            THE COURT:  Why don't you pick up if you can?

16            THE WITNESS:  I'll do the best I can, Your Honor.

17            The question was harm.  And the harm was, as

18   alleged in the complaint, was with you and your client's

19   inability or unwillingness to correct the record, leaving my

20   client no choice, we proceeded to seek relief.  And the

21   relief was the legal fees incurred to either obtain

22   correction, and when correction was not possible, to seek

23   relief from Judge Glenn.

24   BY MR. DOUGLASS:

25   Q    But that's -- this isn't asked and answered because you

Julianne Michelle Reeves, Debtor                              36

1   can't seem to answer the question.  The question is -- he's

2   a big boy.  He can fend for himself.  The -- yes.

3            THE COURT:  He's answered the question.  Ask your

4   next question.

5   BY MR. DOUGLASS:

6   Q    The specific question that he hasn't answered is, what

7   is the specific harm, other than attorney's fees, that came

8   from these false statements that you guys think is such a

9   big deal?

10  A    I would answer this way.  In addition to the legal

11  fees, there were public filings in this Court contained in

12  false records, false statements about business matters and

13  property ownership matters in which my client is vitally

14  interested.

15  Q    Has your client lost any clients as a result of these

16  false statements that you're all so worried about?

17  A    I have no idea.

18  Q    I would think that he would probably tell you if he

19  did, right?

20  A    I have no idea.

21            MR. WEIGENSBERG:  Objection.

22            THE COURT:  Sustained.

23            MR. DOUGLASS:  Sustained on what grounds?

24            THE COURT:  Ask your next question, Mr. Douglass.

25            MR. DOUGLASS:  Don't you have to have grounds to

 1 | object?

 2 |         THE COURT:  Mr. Douglass, ask your next question.

 3 |         MR. DOUGLASS:  I guess we're just doing this

 4 | however we want to do it.

 5 |         THE COURT:  Ask your next question, Mr. Douglass.

 6 | BY MR. DOUGLASS:

 7 | Q    Do you have any understanding or have you come to

 8 | understand that he lost any of his reputation in the

 9 | community as a result of these false statements?

10 | A    I do not know.

11 | Q    Did you sue me for defamation?

12 | A    Excuse me?

13 | Q    Did you sue me for defamation?

14 | A    The complaint contains counts against you for fraud.

15 | Q    Yes or no?  Did you sue me for defamation?

16 | A    No.

17 |         THE COURT:  He answered the question.

18 |         MR. DOUGLASS:  No, he didn't answer the question.

19 | BY MR. DOUGLASS:

20 | Q    The answer is no, he --

21 | A    No, we did not -- no, we did not sue you for

22 | defamation.  We sued you for fraud.

23 | Q    Did you sue me for libel?

24 | A    No.  We did not sue you for libel.  We sued you for

25 | fraud.

Julianne Michelle Reeves, Debtor                    38

1  Q    So why didn't use these other causes of action that you

2  say possibly happened to him as a result of this -- these

3  false statements?  You basically are saying that it's

4  possible that he -- possible that he somehow sustained

5  damage as a result of --

6            THE COURT:  Mr. Douglass, this is an inquest with

7  respect to damages.  Mr. Reeves is seeking to recover legal

8  fees with respect to -- as the damages that he's incurred.

9  That's what this inquest is about.  By virtue of your

10 default judgment, you've admitted the material allegations

11 of the complaint.  That's what's relevant to this inquest.

12           MR. DOUGLASS:  And --

13           THE COURT:  Ask your questions that are relevant.

14           MR. DOUGLASS:  An inquest on damages, Your Honor,

15 is relevant to the damage that was sustained by the

16 Plaintiff, who is not here, so that you can make a decision,

17 which I'm sure is going to be --

18           THE COURT:  Don't lecture me, Mr. Douglass.  Ask

19 your next question.

20           MR. DOUGLASS:  I'm telling you why my questions

21 are relevant.  That's part of the court proceeding.

22 Attorneys are supposed to advise you as to why their

23 questions are relevant --

24           THE COURT:  Mr. Douglass --

25           MR. DOUGLASS:  -- because you're saying they're

 1   not.

 2           THE COURT:  -- ask your next question.

 3           MR. DOUGLASS:  Well, I don't think I'm going to be

 4   heard by you.

 5           THE COURT: $900 in sanctions now.

 6           MR. DOUGLASS:  I've lost my First Amendment rights

 7   and --

 8           THE COURT:  We're now up to $900 in sanctions.

 9           MR. DOUGLASS:  Okay.  So you want me to just

10   leave?  Is that what you want -- you want to just steamroll

11   over me and you want me to just leave?

12           THE COURT:  I want you to ask proper questions.

13           MR. DOUGLASS:  I am asking proper questions.

14   These are very proper questions.  Just because you don't

15   understand them doesn't mean that's not -- those aren't

16   proper questions.

17           THE COURT:  It's up to $1,000 in sanctions.

18           MR. DOUGLASS:  So I guess you'll just steamroll me

19   and the record will reflect that.  Thank you very much, Your

20   Honor.

21           THE COURT:  All right.  Mr. Levy, I have a few

22   questions for you.

23           THE WITNESS:  Good morning, Your Honor.  May I

24   move this, Your Honor, so I can see a little clearly?  Thank

25   you.

1           THE COURT:  You're looking at Exhibit D.

2           THE WITNESS:  May I have a copy of Exhibit D,

3  please?

4           MR. WEIGENSBERG:  Permission to approach?

5           THE COURT:  Yeah.  You can approach.

6           MR. WEIGENSBERG:  Thank you.

7           And Your Honor, can I give him Exhibit E as well?

8           THE COURT:  Yes, you can.

9           MR. WEIGENSBERG:  Thank you.

10          THE WITNESS:  Thank you.  I have the exhibit, Your

11  Honor.

12          THE COURT:  On Exhibit D, page 2 -- page 2 is the

13  numbered page on the top of the right hand --

14          THE WITNESS:  Yes, Your Honor.  I have it.

15          THE COURT:  I'm looking at the entries for

16  December 12th, 13th, and 22nd, specifically about

17  communications, written or oral, of Mr. LaMonica, the

18  Chapter 7 Trustee.

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  I see the December 12th entry of

21  yours, "emails with S. LaMonica, Chapter 7 Trustee, re:

22  scheduling phone conversation."  Was that your first effort

23  at communicating with Mr. LaMonica?

24          THE WITNESS:  No, Your Honor.

25          THE COURT:  When was the first time?

1          THE WITNESS:  The first attempt to engage

2   Mr. LaMonica was a letter that we drafted in our office and

3   sent to him in November.

4          THE COURT:  And that is not -- you haven't included

5   that in your --

6          THE WITNESS:  No, we haven't, Your Honor, because

7   at that point, we had not determined that there was a need

8   to proceed with a request for sanctions.

9          THE COURT:  So tell me, had you spoken with Mr.

10  LaMonica before December 22nd?

11         THE WITNESS:  No, Your Honor.

12         THE COURT:  Had you sent Mr. LaMonica any

13  documents relating to assets that Ms. Reeves had listed on

14  her schedules?  Had you sent it before you spoke to him?

15         THE WITNESS:  Yes.

16         THE COURT:  What had you sent?

17         THE WITNESS:  We sent Mr. LaMonica copies of the

18  documents that are annexed to the letter that was -- to the

19  form of letter that was later sent to Mr. Douglass in this

20  case.  I believe it's the exact same record documents from

21  the Acra system on the real estate, and I just don't recall

22  specifically what else.  But it was the same document.

23         THE COURT:  So you spoke to Mr. LaMonica on

24  December 22nd?

25         THE WITNESS:  It was at or about that time, Your

1  Honor.  I see my entry here telephone -- on the 22nd,

2  "telephone conference with Mr. LaMonica, along with Mr.

3  Alifarag," my associate.

4          THE COURT:  All right.  As best as you recall,

5  tell me what you said and what Mr. LaMonica said.

6          THE WITNESS:  We contacted Mr. LaMonica.  We spoke

7  with him on the phone.  I raised the question with him, had

8  he received our letter concerning this case, and did he have

9  any thoughts about it.  As best I recall, Mr. LaMonica's

10 statement was yeah, I've seen your letter.  I'm not going to

11 do anything here that is not -- nothing in this estate.

12 It's -- the Debtor is treating this as if it's a matrimonial

13 case that the trustee is supposed to litigate her

14 matrimonial.  I told -- I have told her and her lawyer, I

15 won't do that.  But at this point, there's nothing in the

16 estate and my inclination is just to let it proceed to

17 discharge and close.

18         THE COURT:  So you filed the adversary complaint

19 with four counts after your conversation with Mr. LaMonica?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  So you filed this complaint on March

22 27th, 2023?

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  A few days before, on March 24th,

25 2023, Mr. -- the docket in the bankruptcy case reflects a

Julianne Michelle Reeves, Debtor                                    43

1  report of no distribution by Mr. LaMonica?

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  And were you aware of that before you

4  filed the adversary complaint?

5           THE WITNESS:  No, Your Honor.  Only what I've said

6  before that Mr. LaMonica had told me there's really nothing

7  in this estate.  The statements are not credible -- various

8  statements made are not credible.  There was nothing in this

9  estate.  I'm going to let it go.  Let it go is my word, Your

10  Honor.

11          THE COURT:  Sure.  If Mr. LaMonica took that

12  position, why did you believe you needed to file the

13  adversary complaint alleging that -- because Ms. Reeves had

14  listed substantial assets on the Schedule A and B.  If Mr.

15  LaMonica told you that there were no assets in the estate on

16  which he would proceed, why did you go ahead and file the

17  adversary complaint?

18          THE WITNESS:  We had requested that Mr. Douglass

19  and his client or on behalf of his client correct the record

20  so that there would be nothing in the public record

21  indicating statements that were false with respect to my

22  client's ownership of several different assets.  My client

23  -- I'm not going to breach privilege, Your Honor, but my

24  client and I made the determination to proceed, given that

25  we were unable to obtain consensual relief, even after

1  having made a settlement proposal we believe would have

2  resolved this, which was embodied in the letter to Mr.

3  Douglass I sent in late December.

4          THE COURT:  December 27th.

5          THE WITNESS:  That sounds right to me, Your Honor.

6          THE COURT:  December 27th, 2022 (indiscernible)

7  letter.

8          THE WITNESS:  That sounds right to me, Your Honor.

9          THE COURT:  So the complaint in this case contains

10  four causes of action.  The default judgment was only

11  entered on one of the counts in the complaint.

12          THE WITNESS:  Correct.

13          THE COURT:  Do your timesheets attempt to separate

14  out time you expended in connection with the cause of action

15  on which a default judgment has been entered?

16          THE WITNESS:  I can't say that they do, Your

17  Honor.

18          THE COURT:  In reviewing Exhibit D and Exhibit E,

19  have you made an assessment of how much of the fees were

20  charged in connection with the third cause of action alone?

21          THE WITNESS:  I have not, Your Honor.

22          THE COURT:  Do you agree that based on my ruling,

23  you're only entitled to recover fees in connection with that

24  third cause of action?

25          THE WITNESS:  I do agree with that, Your Honor.

Julianne Michelle Reeves, Debtor                          45

1              THE COURT:  How am I supposed to figure that out?

2              THE WITNESS:  Well, there's a couple of choices,

3    Your Honor.  One is you can make an educated guess.

4              Two is --

5              THE COURT:  I don't guess.

6              THE WITNESS:  I know Your Honor does not.  Two is

7    if Your Honor wishes, we can attempt to provide some

8    additional information that, perhaps, would enlighten or

9    reduce the amount that would be -- would change the amount

10   that would be allocated just to the third count.  I find

11   that that will be somewhat different and arbitrary on my

12   part as well.

13             THE COURT:  Counts 1 and 2, which seek a denial of

14   discharge against Mrs. Reeves, those claims don't depend in

15   any way on what assets she listed in her schedules, correct?

16             THE WITNESS:  Correct, Your Honor.

17             THE COURT:  I don't have any more questions.

18             Mr. Weigensberg, do you have any more questions

19   for the witness relating to what I asked about, obviously?

20             MR. WEIGENSBERG:  Yes, Your Honor.  Yes.

21             No.  I think at this time, unless the witness

22   wants to expand on any prior answers, I don't --

23             THE COURT:  Mr. Douglass, do you have any more

24   questions that relate to the scope of my questions?

25             MR. DOUGLASS:  I do not, Your Honor.

1          THE COURT:  All right.  Thank you very much, Mr.

2    Levy.  You're excused.

3          THE WITNESS:  Thank you, Your Honor.

4          (Witness excused.)

5          THE COURT:  Do you want to call any other

6    witnesses?

7          MR. WEIGENSBERG:  No.  We will not be calling

8    any --

9          THE COURT:  Do you rest?

10          MR. WEIGENSBERG:  We do.

11          THE COURT:  Okay.  Mr. Douglass, do you wish to

12    put on a case?

13          MR. DOUGLASS:  I do not, Your Honor.

14          THE COURT:  Do you rest?

15          MR. DOUGLASS:  I rest.

16          THE COURT:  All right.  Both sides have rested.

17          Any closing argument, Mr. Levy or Mr. Weigensberg?

18                    <u>CLOSING ARGUMENTS</u>

19          MR. LEVY:  Your Honor, putting back on my

20    advocate's hat, given that the fact that I was a witness is

21    not a disqualifier to my speaking to the Court in this

22    capacity.

23          Your Honor, we have explained in our papers and

24    through the testimony of -- the -- my testimony as witness,

25    the basis for the damages that are asserted by our client

1  and the quantification of the damages asserted by our

2  client.  I submit that there has been nothing to question

3  the validity of the information that we have presented.  We

4  have made our prima facie case and there's been nothing to

5  poke any holes in it.

6          With the exception of the question posed by Your

7  Honor, which is a correct one, and as I've told Your Honor,

8  the difficulty both the Court and I would have is how to

9  allocate among several different counts for the damages that

10  were incurred.

11          It's hard for a lawyer in the course of preparing

12  a case to know how much is allocated to any one count when

13  the services are rendered relating to the entirety of the

14  work product.  That's really all we can say, Your Honor.

15          We've acted in good faith.  We've acted in

16  accordance with our professional responsibilities.  And

17  believe that Your Honor should find and award damages

18  against Mr. Douglass.

19          THE COURT:  Thank you, Mr. Levy.

20          Mr. Douglass, closing argument?

21          MR. DOUGLASS:  All I'm really going to say is that

22  I do believe it is relevant the question of damage.  I think

23  that's what we're here for, a damage inquest -- an inquest

24  on damages, that we should be able to ascertain how much

25  damage was done to Mr. Reeves by these alleged, which have

Julianne Michelle Reeves, Debtor                        48

1   been proven, false statements in the bankruptcy filing.

2          I would simply state that because I was asking

3   questions to Mr. Reeves during his matrimonial that he did

4   not like, such as, isn't it true that you like to keep Mein

5   Kampf on your bedside table?  That he was looking for any

6   way that he could come after me, and he decided that he

7   would seek out these attorneys, and they would probably, I

8   would imagine, maybe it's speculation, but this is my

9   closing statement and I believe this to be true upon

10  information and belief, that he asked these attorneys to

11  come after me one way or the other.

12         And they saw the bankruptcy filing, and they

13  determined that it was -- these were false statements, and

14  they decided to load up their attorney's fees to come after

15  me to harm my financial status, which he says that's under

16  the professional rules acceptable.  Maybe it is.  But then

17  the professional rules need to change because that is not

18  moral.  That is not right.  And it should not be acceptable.

19         I work very hard for our community.  I have fought

20  power plants because I believe our planet is in danger.  I

21  have fought on behalf of parents, who have had the system

22  take away their children for no good reason.  I hope that

23  means something to Your Honor.  I can see you saying these

24  are not relevant to what's happening.  I think I can read

25  your mind.  But I believe we should not live in bubbles.  We

Julianne Michelle Reeves, Debtor                              49

1  should live in the real world that is actually suffering

2  tremendously, and I have done a lot of work for all of us,

3  and Mr. Reeves is coming after me because he didn't like me

4  calling him out as a Nazi.

5          So thank you very much, Your Honor, and that's all

6  I have to say.

7          THE COURT:  All right.  I'm taking the matter

8  under submission of the Court.

9          I'll enter appropriate orders in addition to

10 $1,000 in sanctions, which accumulated at $100 for each

11 outburst by Mr. Douglass, totaling at the end $1,000.  That

12 will be payable to the Clerk of the Court.  I will enter an

13 order in due course.  We're adjourned.

14         MR. LEVY:  Thank you, Your Honor.

15         MR. WEIGENSBERG:  Thank you, Your Honor.

16         (WHEREUPON, the proceedings concluded at 10:53

17 a.m.)

18                          * * *

19

20

21

22

23

24

25

1

2                          I N D E X

3

4  WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

5  RICHARD LEVY                 9      16

6

7                                                    PAGE

8

9  PLAINTIFF RESTS                                   46

10 DEFENDANT RESTS                                   46

11

12 CLOSING ARGUMENTS:

13 PLAINTIFF BY MR. LEVY                             46

14 DEFENDANT BY MR. DOUGLASS                         47

15

16 COURT'S ORDER/DECISION/RULINGS:

17  UNDER SUBMISSION OF THE COURT                    49

18  SANCTIONS AGAINST MR. DOUGLASS - $1,000          49

19

20

21                     E X H I B I T S

22 NO.      DESCRIPTION                  ID    ADMITTED

23 1        MR. LEVY'S DECLARATION

24          WITH EXHIBITS A THRU E                8

25

1

2                    C E R T I F I C A T I O N

3

4          I, Nancy B. Gardelli of Acorn Transcripts, LLC , a

5    federally approved transcription service, hereby certify

6    that the foregoing transcript is a correct transcript, to

7    the best of my ability, from the official electronic sound

8    recording of the proceedings in the above-entitled matter.

9

10   ACORN TRANSCRIPTS, LLC

11

12

13

14   /s/ *Nancy B. Gardelli*          Dated: April 16, 2024

15   Nancy B.  Gardelli

16   Court Approved Transcriptionist

17

18

19

20

21

22

23

24

25